DUNCAN *v.* NEW YORK MUT. INS. CO.

(*Superior Court of New York City, Equity Term.* October, 1891.)

MARINE INSURANCE—CANCELLATION—IGNORANCE OF FACTS—RIGHTS OF INSURED.

Where a policy of marine insurance is canceled, by mutual consent, on the return of a ratable amount of the premium, and neither party, at the time, was aware or had

any means of knowledge that the insured vessel had been lost at sea, the cancellation is voidable, as made in ignorance of a material fact, and the assured is entitled to recover the amount of the policy, less the amount of the premium returned.

Action by William B. Duncan, Jr., against the New York Mutual Insurance Company on a policy of marine insurance.   Judgment for plaintiff.

*Wheeler, Cortis & Godkin,* (*Everett P. Wheeler,* of counsel,) for plaintiff. *North, Ward & Wagstaff,* (*J. Langdon Ward,* of counsel,) for defendant.

GILDERSLEEVE, J.   The Steam-Ship Samana Company, Limited, an English corporation, was the sole owner, on the 3d day of August, 1888, of the steam-ship Samana.   The total amount of the stock of said company was $50,000, all of which was owned and held by the plaintiff, except 6 shares of $5 each, which were equally divided among and held by 6 other persons.   The plaintiff was managing director, acted as agent of the company, and had entire charge of all its business.   The plaintiff procured the defendant to issue its policy of insurance, bearing date July 31, 1888, and the portions of it material to the issues here raised are as follows: "By the New York Mutual Insurance Company, W. B. Duncan, Jr., on account of whom it may concern, in case of loss to be paid in funds current in the United States or in the city of New York to Steam-Ship Samana Company, Limited, doth make insurance and cause to be insured, at and from August 3d, 1888, at noon, to August 3d, 1889, at noon,   *   *   *   upon the body, tackle, apparel, ordnance, munition, artillery, boat, and other furniture of and in the good steamer or vessel called the 'Samana.'   *   *   *   The said ship, etc., for so much as concerns the assured, by agreement between the assured and assurers in their policy, are and shall be valued at as follows:   Hull, tackle, apparel, and furniture, $25,000; machinery and boilers, $20,000,—forty-five thousand dollars; sum insured, $5,000; seven per cent. net.   To return *pro rata* premium for every thirty days of unexpired time, if this policy be canceled, on arrival.   *   *   *   It is agreed that any change of interest in the vessel hereby insured shall not affect the validity of this policy."   At the time this policy was issued, the plaintiff, acting as agent for the Steam-Ship Samana Company, paid to the defendant $350, the required premium on said policy.   On or before November 15, 1888, the plaintiff, on behalf of the Samana Company, sold and delivered said steam-ship Samana to the Banana Steam-Ship Company, Limited, a company also organized under the laws of the United Kingdom of Great Britain and Ireland, for the sum of $41,000.   A portion of the purchase price was paid down, and the balance, $28,500, secured to the plaintiff by a mortgage of that amount on the said steam-ship Samana, executed by the Banana Steam-Ship Company on the 15th day of November, 1888, that being the date of the bill of sale whereby the Samana was transferred to the Banana Steam-Ship Company.   This sale and transfer were made in pursuance of an agreement in writing between one Colville, representing the proposed purchaser, and the plaintiff on behalf of the Samana Company.   This agreement provided that the insurance then existing upon the Samana should stand and be held for the benefit of the vendee until other policies could be arranged, and that the vendee should pay the unearned premium up to such time.

On the 22d day of November, 1888, the Samana sailed from the port of New York, bound for Aux Cayes, a Haytian port.   The normal length of the voyage for the Samana from New York to Aux Cayes was seven days.   There was at that time no telegraphic communication between New York and Hayti, and no means of learning of the arrival or non-arrival of a vessel at a Haytian port except by steamer or sailing vessel.   On or before the 3d of December the policy was presented to the defendant, with a paper partly written and partly printed in the words and figures following: "Clause added to policy No. 31,466 of New York Mutual Insurance Company issued to W. B. Duncan, Jr., steam-ship Samana.   At the request of the assured, this policy

is hereby canceled at and from December 3d, 1888, at noon. *Pro rata* premium to be paid for eight months, not used, $233.33." The defendant's president did not sign the said paper, but wrote across the face of the policy, "Canceled at request of assured. R. P. for eight months, December 3, 1888;" and indorsed thereon, "Pay two hundred and thirty-three 33-100 dollars return prem., and cancel policy, December 3, 1888. $233 33-100." In a previous action between the parties hereto, brought on the policy above set forth, to recover the sum of $5,000, tried by the court and a jury, the jury rendered a verdict for the plaintiff for the full amount claimed. The learned judge presiding at that trial granted a new trial on the ground that the cancellation of the policy could not be annulled, at least until the plaintiff had returned, or offered to return, the sum received by him on the cancellation, and until that cancellation should be completely annulled there was no cause of action for a loss. Thereupon the plaintiff tendered to the defendant the sum received by him on the cancellation, and demanded a rescission of the agreement of cancellation which had been made, and, when this was refused, brought the present action. This action is to rescind and set aside said cancellation, and to recover as for a total loss, upon the policy of insurance above set forth, the sum of $5,000, less the sum of $233.33 received by the plaintiff for return premium at the time of the cancellation, with interest from the 26th day of November, 1888.

It is established by the testimony that when the Samana sailed from the port of New York, November 22, 1888, she was properly manned, with a competent master and sufficient crew, and was sufficiently equipped with coal and other necessaries for her voyage to the port of Aux Cayes; that she was properly loaded, and was in all respects seaworthy for said voyage. It appears upon sufficient evidence that on or about November 22, 1888, a hurricane began off the southern coast of Florida, passing northward, and that on the evening of November 24th the center of said storm was south-east of Cape Hatteras, at which time the Samana, if she had kept her proper course and average speed, would have been very near said storm center; that said storm was of extraordinary violence, and adequate to cause the total loss of a vessel of the size and build of the Samana. The Samana has never been heard from since she sailed from New York on November 22, 1888. No wreckage of any kind from her has ever been found. The irresistible conclusion is that during said storm she went down with all on board, and became a total loss, prior to the 3d day of December, 1888, and that said loss was by or in consequence of some of the perils insured against by the policy in suit. In April, 1889, the plaintiff presented to the defendant's agent proofs of loss and interest, to the sufficiency of which the defendant did not object, but refused to pay. It was conceded on the trial that all questions herein, except as to the nature and effect of the cancellation of the policy, and the right to rescind or set aside said cancellation, had been decided adversely to the defendant by the general term of this court (McAdam, J., writing the opinion) in the case of the plaintiff herein against the China Mutual Insurance Company, 14 N. Y. Supp. 301, an action to recover upon an insurance policy for the same loss upon which the claim herein is based. In that case the judgment of this court has since been affirmed by the court of appeals, (O'Brien, J., writing the opinion,) 29 N. E. Rep. 76. An examination of these opinions discloses full warrant for the concessions.

We now come to the discussion of the only questions that present any difficulty in the disposition of this case: *First.* What was the nature and effect of the cancellation? *Second.* Should the cancellation be set aside?

In the opinion of the learned judge setting forth the reasons for granting a new trial of the first action upon the cause of action herein, it does not appear what the nature or character of the cancellation was held to be; nor does it appear from this record what witnesses were examined, or what the testi-

mony was, on that question.  We must assume that substantially the same testimony was given as was elicited on this trial.   The effect of the cancellation, as viewed by the learned judge, is clearly expressed, namely, that "until that cancellation should be completely annulled there was not cause of action for a loss."   Had we encountered this proposition as an original question, we should not have adopted the view that controlled the learned judge in granting the motion for a new trial.   We are disposed now, however, to decide this case upon the lines indicated in that opinion.   This, the second, action, was modeled to meet the views set forth there, and may be determined in full justice to all parties with due regard to the law as laid down by the learned trial judge in the first action.   We have, as evidence of the nature of the cancellation, or of the terms of the agreement to cancel, the indorsement upon the policy, and the "slip" presented by the plaintiff's agent, both above set forth, and the testimony of Bleeker, Eustace, and Hughes.   A question of fact is here presented as to what was agreed between Bleeker, the president of the defendant, and Eustace, an insurance broker, representing the plaintiff, at the time the application for cancellation was made.   Was this agreement upon the terms mentioned in the above-quoted paper partly written and partly printed?   Eustace, a disinterested witness, testified that it was. Bleeker, president of defendant, and therefore an interested witness, denied this.   Bleeker's testimony indicates that his recollection of this transaction is not good.   At one time he states that the above paper, commonly called a "slip," was handed him by Hughes, and that he then and there refused to sign it.   At another time he testifies that when it was handed to him he did not read it, and simply said that he would look at it.   Again, he says that the slip was handed him by Eustace.   Bleeker retained the "slip" and produced it on the trial.   Upon the whole evidence on this question, and especially in view of Bleeker's interest in this case, his own contradictory testimony, his contradiction by both Hughes and Eustace, and his retention of the slip, we must conclude that Eustace's version of the interview is correct. We conclude, therefore, that by the terms of this agreement the policy in question was canceled at and from December 3, 1888, at noon, and that the effect of this agreement was to change the policy from a contract of indemnity for a year to a contract of indemnity for four months, i. e., from August 3, 1888, to December 3, 1888.   This did not relieve the defendant from any liability that arose under said policy prior to December 3, 1888.   We have already held that the loss occurred, and the right of action herein accrued, prior to December 3, 1888.   It cannot be said that the cancellation agreement operated retroactively to cut off any claim for damages under the policy existing at the time.   *Baker* v. *Insurance Co.*, 51 Mich. 243, 16 N. W. Rep. 391. The learned trial judge must have acted upon the theory that the cancellation of the policy at the request of the plaintiff, and his acceptance of the *pro rata* premium for the remaining eight months of the term of indemnity for which the policy was originally issued, operated as a release of any claim for damages that may have arisen within the first four months of the policy's life, and therefore no cause of action could be maintained for a loss until the cancellation should be annulled.

The second question presented on this trial is, should the cancellation be set aside?   On the day of the cancellation, it was not possible that information as to the arrival or non-arrival of the Samana at her port of destination could have reached either the plaintiff or the defendant.   The plaintiff's request to cancel was a right the contract gave him, and compliance on the part of the defendant was its plain duty.   There was no deception by either party, nor any suppression of facts.   The plaintiff testified that, when he made the application for cancellation, he supposed that the steamer had reached Aux Cayes, and was in safety.   Bleeker testified that he did not know or consider whether the steamer had or had not reached her port of destination.   In the

mind of one there was a positive error, while in the mind of the other there was ignorance, which in this connection yields the same fruit. The cancellation of the agreement accomplished what was not contemplated by the parties. The injury for which plaintiff had purchased from defendant indemnity had been done. The defendant's liability existed. It gave up nothing in satisfaction of the liability. The liability was not contemplated, because it was unknown. Its materiality is patent. The defendant was not prejudiced by the omission of the plaintiff to give it at an earlier date formal notice of his election to rescind the cancellation. In April, 1889, he notified the agent of the defendant in writing that he claimed to recover as for a total loss upon the policy. This had the effect of a formal notice to rescind. The acts of December 3, 1888, in respect of the policy here sued upon, came within the general rule of equity which holds "that an act done or contract made under a mistake or in ignorance of a material fact is voidable and relievable in equity." See Story, Eq. Jur. § 140 *et seq.* See, also, *Belknap* v. *Sealey,* 14 N. Y. 143; *Martin* v. *McCormick,* 8 N. Y. 331. The application of this rule is no hardship to the defendant. It gets all it asks by way of premium, and is forced to meet such obligations only as it assumed when it contracted to furnish plaintiff indemnity. It leaves the parties standing in the same position they held before action was taken in ignorance of existing facts that are material to the transaction. The plaintiff is entitled to judgment for $5,000, less $233.33, with interest from April 8, 1889, the date when the proofs of loss were submitted, besides the costs of the action.